Chief Justice Bibb,
not concurring with the majority of the court in maintaining the lien asserted by Eubank, the assignee of Calloivay the vendor, in preference to the claim of the purchasers under the mortgage of Ritchie, the vendee, delivered his own opinion.
On the 28th of March, in the year eighteen hundred and seventeen, Edmund Calloway and wile, by their indenture, duly acknowledged and recorded in the proper office on the same day, conveyed to James Ritchie, two lots of land in the town of Winchester, in consideration of ten thousand dollars.
In the deed, the consideration is expressed to have been paid, the receipt is acknowledged, by the said grantors, and they, therein, and by said deed, “thereof, and from every part and parcel thereof, do hereby acquit and discharge him, the said James Ritchie, his heirs, executors and administrators.”
Ritchie being indebted to the President, Directors & Co, of the Bank of Kentucky, by several notes *296 discounted at their Winchester office the one endorsed by John Hume and William Poston, for $1,300; another for $900, endorsed by said Robert Didlake, and William Poston, another for $1,000, endorsed by said Poston, to secure the said Didlake, Plume, and Poston on the 8th of March 1820, conveyed to said Poston the lot No. 2, purchased of of Calloway, and all that part of lot No. 7, purchased of Calloway, except the part conveyed by Ritchie to William Boggs, upon condition that if the said Calloway should fail to pay the notes, or any part, or any note which should be given to renew said notes, or any part, whereby the said sums, or any part thereof, should devolve on said Didlake, Plume, and Poston, or either of them, that Poston should sell the premises, or so much as should be sufficent to reimburse the said Didlake, Hume and Poston, or either of them, the sums so falling on them by reason of their endorsements; but if Ritchie discharged the debts, and saved his endorsers from loss or harm, then Postor to re-convey to Ritchie; this deed was duly recorded on the 9th of March 1820. Ritchie failed to pay these notes; and Poston having paid them, on the 9th of June, 1821, exhibited his bill against the widow, and heirs of Ritchie, whq was dead and insolvent, and no administration granted, and so proceeded, that at September term of the Clarke circuit court, In the year 1821, the premises were decreed to be sold to raise the money so paid by Poston; at this sale, on the 1st of January, 1822, Poston became the best bidder for part, Joseph Decreet, for another part, and James B. Duncan, for another part; which sales were reported to the court and confirmed.
Dissent ofCli. J. Bibb, from the majority of the court, upon the question of the lien of the ven dor, after a sale and conveyance of the estate, assorted against a mortgagee of the purchaser.
In December, 1821, after the decree in favor of Poston for the sale, but before the sales actually made, Achilles Eubank exhibited his bill in equity, against the heirs of Ritchie, Edmund Calloway, and Poston, setting up, as the assignee of Calloway, a lien upon the premises so conveyed to Poston, by virtue of a note for two' thousand dollars, executed by James Ritchie, to Edmund Calloway on the 22d of Dec. 1813, payable on or before the 8th of January, 1818; assigned’ to Eubank, on the 14th *297 $íay, 1818, he refers to the bill and proceedings of Poston aforesaid, as part of his bill, and charges Poston with notice, at the time he received the conveyance, from Ritchie, of Calloway’s lien, and that this note was part of the purchase of the premises, and that it was wholly unsatisfied; the bill also charges that Ritchie at his death was insolvent; that said assignee of Calloway had obtained judgment at law, and issued execution, and that the whole judgment remains unsatisfied.
Dissent of Ch. J. Bibb,
It appears by reference to the judgment referred to in the bill as a part of it, that Eubank obtained a judgment for the full amount of the note, and issued execution for the full amount, and claimed by his bill the full amount of the judgment.
Poston, by his ‘answer, alleges, that the sum of $1073. 74 cents, was paid to Edmund Calloway, and that fact is proved.by an exception made in the assignment by Calloway, and by the receipt endorsed upon the note, but not credited on the judgment or execution; he pleads his mortgage, and decree and sale, and that he was a fair and bona fide creditor of said Ritchie, and ought not to be deprived of the advantage he has obtained as well by his mortgage, as by his decree, and the sale under it; but he does not deny, nor yet expressly admit, the notice of Calloway’s lien at the time lie obtained the conveyance from Ritchie; he, by íiis answer, refers to the sales then concluded; insists, as Eubank had endorsed his execution, that he would receive notes of the Bank of Kentucky in discharge of it, which were at a discount, that if his lien should be considered as superior, and to be enforced, that it should be only for the value of the debt so agreed to be taken in that paper; he relies upon, and proves a tender made by him of the amount so due in that paper, and the refusal by Eubank; he insists upon a contribution by the purchasers of the property at the sales under the decree, and upon an arrangement made between the several purchasers to that effect, based upon their agreement to contribute, if under all the circumstances, the lien of the complainant shall be considered as existing, and requires of him *298 to make those other purchasers defendants; but for greater security in that behalf, Poston, (according to the statute in such cases provided) makes Decreet and Duncan parties.
Dissent of •Ch. J. Bibb.
The answers of Decreet and Duncan, resist the lien, but insist if it should be enforced, that it be reduced to the value in paper of the Bank of Kentucky.
Duncan relies on a purchase of the property made by him at sheriff’s sale, under the execution of Eu-bank, and other executions, and that Eubank’s execution against Ritchie was levied on the property by the express direction of Enbank’s attorney, and ■makes his answer a cross bill against Eubank; this part of the defence may be dismissed, with this remark: although the sale was made by the sheriff, it was illegal, and the purchase by Duncan was only ■colorable, and not real.
In Api’il, 1823, Eubank, by leave of the court, by ■an amended bill, referred to, and exhibited the record of his suit at law against Ritchie, and of a suit in chancery, by Ritchie against Calloway and Eu-bank, with injunction against the judgment at law, upon an equity alleged against Calloway; stating that the judgment, although rendered for the full amount, was subject to a credit for money paid Calloway; and endorsed; and for tiie residue, claiming ■to retain it, because of his being security for Calloway in a bond to Jacob Holderman, for about ‡1 - ■300, upon the express agreement that he should retain the balance of this note as indemnity; that said debt remains unpaid, the co-security George G. Taylor insolvent, and Calloway removed from Clark to Christian county, and in declining circumstances; that the note sued on by the assignee of Calloway is reduced by the credits thereon, to a sum not sufficient to indemnify Ritchie. . Eubank, by his answer denied any knowledge of the equity, and put Ritchie upon proof of it; except as to the credits endor seel upon the note. As to the proceedings in Ritchie’s injunction, they need not be more particularly stated at this time, than that upon the hearing, the injunction was dissolved, and the bill dismissed, each party to pay his own costs.
_ Dissent of Ch. J. Bibb,
Upon- tlie hearing, the court gave to'Eubank, the assignee, a lien for the note so assigned by Calloway, but reduced the sum to the value in paper of the Bank of Kentucky; which Eubank, by endorsement on his execution had agreed to accept, Eu-bank, not-content with this, has brought the record into this court, claiming more than, was decreed, him.
As 1 think Eubank has already a decree againstPoston,, and those claiming under him, to which he is not entitled, 1 certainly cannot consent to decree him more. According to my understanding, Calloway had no lien upon, the estate in the hands of, Poston; and Eubank had none..
The lien wich a vendor has in equity, upon the. estate sold, for the payment of the purchase money, is the. mere creature of equity; it is created by no express contract; it is of no positive institution; but is moulded by the court according to ■ circumstau- - ces. As it is the creature of equity, so it must be-kept by the court in proper limits, and regulated by safe rules.
That a vendor has a liten in equity upon the estate sold, for payment, of the purchase, so long as the estate remains with his vendee and his heirs,, provided he has taken no security for the purchase money, nor done any other act showing an intention to abandon his lien, is well settled. So long as this lien is confined to vendor and his immediate vendee and his heirs, it has no inconvenient effect; there is a natural equity in it- to this extent. It is equally well settled, that this lien is defeated by alienation to a purchaser without notice. What other acts shall defeat the lien, either as against the vendee or against a purchaser from him, have been subjects upon which- chancellors have- differed. Many vexed and vexing- questions have arisen, some of which are not settled to this day. For the sake of brevity, I shall content myself with, a reference to the cases of Blackburn vs. Gregson, 1 Brown chan. ca. 424, and cases cited in note (a,) fourth edition; Nairne vs. Prouse, 6 Vez. 752, and note 2, in first American, edition; Brown vs. Gilman, 4 Wheat. *300 277, and Judge Story’s opinion in same case, (4 Wheat. 292;) Mackreth vs. Symmons, 15 Vez. 329 to 342.
Dissent of Ch. J. Bit*,
By examining these cases, and those therein referred to, it will be distinctly sefcn, that the doctrine upon this subject of lien is brought to a most distressing uncertainty; it is full of difficulties, doubts and subtile distinctions, insomuch, that Lord Eldon has said in Mackreth vs. Symmons, (15 Vez. 341;) ‘-it is impossible for any purchaser, to know, without the judgment of a court, in what cases a lien would exist, and in vVhat cases it would not exist.” This is not ail exaggerated picture. I consider the doctrine of implied lien, when applied to cases betwen vendor, and his immediate vendee, who yet retains the estate, as attended with no serious mischief, but accords well with tlie principles of equity. These parties are cognizant of their dealings, trusts, discounts and set offs, and can prosecute and defend their rights, But to involve third persons in these secret trusts arid dealings, between vendor and vendee, I do not think wise, politic or equitable. To push this lien, in favor of a vendor who has parted, with his title and possessidn, taken a separate document for his debt, and given an acquittance under his hand and seal for the purchase money, against a purchaser who has acquired the title, and holds this solemn assurance, that the purc hase money is paid; 1 consider as a cancer upon the body politic; painful and distressing to society, at war with that security of tenure and title to real estate, essential to the interests and happiness of the community, and in violation of the spirit and policy of the statutes of enrolments, and of frauds and perjuries. A cure ought to be sought for and applied, in administering for this, the rude boldness of Doctor Last, who would amputate a toe to cure a corn, and the solemn formality of Sangrado, who would continue to drench with warm water for a cancerous disease, are equally to be shunned.
The principle upon which this lien is created is, that in respect of the unpaid purchase money, or of so much of it as remains unpaid, the vendee is considered as a trustee 'of the estate for the vendor. *301 (Blackburn vs Gregson, 1 Brown, ch. ca. 424; Pollexfen vs. Moore, 3 Atk. 273; Bayley vs. Greenleaf, 7 Wheat. 50, 51.) It is not, by an express agreement, but by implication. It is not a direct charge on the estate, but only an equity "to resort, to it, in case the personal estate prove deficient. Being but ¡an equity, a mere resulting trust, it may be repelled, defeated and destroyed by circumstances, which show that thé vendor did riot intend to rely upon his lien, or if rélied óii at first has been abandoned. It is founded on a Supposed intention of the parties, and ceases to act, whenevér the circumstances will warrant the conclusion, that the vendor did not intend to rely upon it as security. This is the rule to be extracted from the cases; it is the principle distinctly recognized in the case of Brown vs. Gilman, 4 Wheat. 290, and 293.
Dissent of Ch. 1. Bibb.
1st. The first question for consideration, is of fact and intention- whether from the circumstances, Calloway had not manifested an intention, before, and at the time of the assignment of the note in question, to Eubank, to waive and abandon any lien which he may have had upon the houses and lots
It is alleged by the bill, and the equity is claimed, and is in no other way supported, than as growing out of a sale of the houses and lots by Calloway to Ritchie, in 1813, for ten thousand dollars. The note assigned to Eubank, bears date on the 22nd December, 1813, and is payable on the 8th January, 1818, for two thousand dollars. Upon its face, it has no reference tó the sale and purchase of the estate made by Ritchie; it is a simple promissory note. Its connexion with the purchase depends upon the bill and answer of Calloway. No articles of purchase and sale are produced, nor when or how the residue of the ten thousand dollars were payable; supposing this note to be for part of the purchase, then from 1813-, up to the 28th March, 1817, Calloway did retain a lien on the estate, by retaining the title. But on that day, he conveyed the estate to Ritchie, by deed, acknowledging therein, in the most solemn manner, a receipt of the con. *302 sideration of $10,000. No mortgage is taken, nt? agreement is spoken of about retaining a lien. After retaining the title for four years, and. then conveying it to Ritchie, with a full receipt in the face of the deed, is it not fair to infer an intention to. abandon the lien, and look alone to the security which he held by hote of hand for the purchase money unpaid? If by the original agreement it had been expressly stipulated that Calloway should retain, the title, until a certain portion of the purchase money was paid, and when so paid, that the title should he conveyed, no doubt could have remained, that such after-coilveyance would be construed to be an intention to look to the note and personal responsibility of Ritchie, and to waive the lien on the lots. In the language of the court, in the case of Brown vs Gilman, (4 Wheat. 290) “this is equivalent to a mortgage of the premises, to secure the first payment, and a consent to rely on the separate notes of the purchasers, for the residue of the purchase money. The express contract, that the lien shall be retained to a specified extent, is equivalent to a waiver of that lien to any greater extent.”' The acts of the party here in retaining the lien for that length of time, and until all hut the last note was paid, is as satisfactory evidence of an intention to waive the lien after the deed was made, as if the evidence of intention was contained in a written contract. The writing would be but evidence of the facts. The acts done here are evidenced by the writings, and declared by the bill, and uncontested; the same conclusion from the same facts must follow, whether those acts be attested in the one way, or in the other.
Dissent of! Ch. J. Bibb.
But the vendor having retained the title from 1813 to 1817, as security, then parted with it, and in May following assigned the note to Eubank; this is another evidence that Calloway did not, when he conveyed the estate in 1817, look to that estate for security. He looked to the note; and by negotiating it, gave another indication of intent to-abandon any lien. See Band vs. Kent, 2 Vern. 281. The transfer of the note could not be supposed to. draw after it, a lien upon the land in favor of theassignee. ’
Dissent of Ch. J. Bibb.
Secondly. Eubank did not acquire any lien. The lien raised' by implication between vendor and vendee, does not extend to a third person; but is confined to vendor. The rule is so laid down expressly by Lord Hardwick, in Pollexfen vs. Moore, (3 Atk. 272.) Thomas Moore had agreed to purchase an estate of Pollexfen, called Orchard, in Somersetshire, for £1,200, but died before he paid the whole purchase. Moore by his will, gave a legacy of £800, to his sister Mrs. Moore; and devised the estate purchased, and all his personal, estate to John Kemp, whom he also made executor. Kemp committed a devastavit and died, and the purchased estate descended to Boyle Kemp, his son and heir at law. Pellexfen brought his bill against the representative of the real and personal estate of Moore and Kemp,, to he paid the remainder of the purchase money; and thereupon, Mrs. Moore, the sister and legatee of Thomas Moore, brought her cross bill, and prayed that if the remainder of the purchase money should be paid to Pollexfen, out of the personal estate of Moore and Kemp, that she may stand in place of Pollexfen, and he considered as having a lien upon the purchased estate for her legacy of £800. Lord Hardwick in delivering his decree, said, “The vendor of this estate has, to be sure, a lien on the estate he sold for the remainder of the purchase money; for, from the time of the agreement, Thomas Moore was a trustee as to the money for the vendor. But this equity will not extend to a third person, but is confined to tire vendor and vendee; and if the vendor should exhaust the personal assets of Moore and Kemp, the defendant, (Mrs. Moore,) will not be entitled to stand in his place, and to come upon the purchased estate in the possession of Kemp’s heir. But then the heir of Kemp shall not avail himself of the injustice of his father, who has wasted the assets of Moore,' which should have been applied in paying the legacy.” He, therefore, decreed that the vendor, Pollexfen, should take his ■ satisfaction out of the estate sold by him, which he said “had descended from John Kemp, the executor of Moore, upon Boyle Kemp; liable to the same equity as it would have been against the *304 father, who has misapplied the personal estate;53 thereby leaving the personal estate open for Mrs. Moore. The lien was enforced in favor of the vendor; with a distinct rejection of Mrs. Moore’s application to stand in plate of the vendor. In Coppin vs. Coppin, (2 Pr. Wms. 291,) John Coppin was both heir and executor. The will as to lands was not executed according to the statute, being attested only by two witnesses, so that John Coppin took the lands as heir, and not as devisee. The will as to the personal estate was valid; and after giving considerable legacies, gave the residue of his real and personal estate to the said John. The will also directed his debts, which he had formerly compounded at ten shillings in the pound, to be paid; and charged his real estate with the payment. The will was not valid as to the lands; the personal estate was insufficient to pay debts and legacies. The creditors and the legatees exhibited their hill against the said John Coppin, the heir and executor for payment, and endeavored to charge the lands. It appeared that the said John, now heir and executor, had sold the lands to the testator Francis. The legatees had received but a moiety of their legacies; and brought their hill for the residue. The creditors brought their bill, to be paid their debts; and the executor John Coppin, brought his hill to recover hack a part of the legacies, alleging he had paid beyond the assets; the personal estate having suffered unexpected losses. As the will had but two witnesses, the lands could not be charged by virtue of the will, with debts or legacies; and John Coppin took it as heir to his brother Francis, the testator.. It appeared that John had sold this land to the testor; and given a receipt for the purchase money; but. in truth it was not paid. The executor claiming to retain the purchase money out of the personal assets; the creditors and legatees, insisted, that under the circumstances of the case, the said John who stood as vendor, heir and executor, should be compelled to satisfy his claim as vendor, out of his lien on the land for the purchase, and thereby relieve the fund of personal assets from the debt due for the purchase money, and so leave it for payment *305 éf the other debts and legacies. Bat the chancellor, (as in the case of Pollexfen, vs. Moore,) refused to suffer the creditors and legatees to meddle the lien of the vendor; but permitted the executor to retain the whole of the purchase money out of the personal assets, and to take the real estate as heir clear of any charge of debts or legacies, and clear of the lien of the purchase money. This is a strong case to shew that this lien exists and is enforced only as between vendor and vendee, and his heirs &c. and not in favor of a third person. And Mr. Sugden* in his valuable treatise on vendors, in treating of the lien for the purchase money, (p. 358,) says* “it must be remarked, that although equity raises this lien in favor of a vendor, yet it is not extended to third persons. In this Mr. Sugden has truly stated the doctrine decucible from the cases, that a third person shall not be permitted to claim this lien against the vendee and thpse holding under him; and that a court pf equity will not extend this lien in favor of any person claiming to stand in the place of vendor, howsoever it may be extended against those claiming under the vendee, as heirs, and purchasers with notice. I have seen no case decided in England, nor in any of the courts of our sister States, where a third person has been permitted to assume the place of the vendor, and enforce the lien; on the contrary, as often as such a claim has been presented, those courts have refused to allow it.
Dissent of Oh. J. Bibb.
Dissent óf Ch. j. Bibb
The propriety of refusing any but the vendor? himself, to wield this lien, (and I will add, the inconvenience of extending the lien, against purchasers from the vendee* who hold the legal title, in favor of a vendor who sets up the lien, against his own receipt for the purchase money,) is well illustrated by the matters appearing in this very case. The vendee, Ritchie, in his life time, exhibited his bill with injunction against Eubank the assignee, .and against Calloway the assignor; and it is difficult to perceive any cause why his injunction was dissolved and his bill dismissed, other than the advantage which the assignee, Eubank, had, in professing his ignorance, and in calling for proof,. of matters *306 alleged against his co-defendant Calloway, and in rejecting the admissions in the answer of his co-defendant Calloway, as not being evidence against Eu-bank, (according to the established doctrine of this court, in such like cases.) Again, in this case, the complainant asserts his demand against.Poston, (and the other purchasers under the decree of foreclosure,) to the full amount of the judgment and execution at law. On these there is no credit for the sum of one thousand and seventy-three dollars, seventy-four cents, which was paid to Calloway before assignment; Calloway’s answer is silent as to this payment On the note of $2,000, so assigned by him to Eubank; and Poston has been obliged to trace this credit, and establish it by proof. It must ever be highly inconvenient and oppressive upon a subpurchaser, to be called to respond to a lien depending upon matters inter alios acta; and the peril of his situation is increased, when it is the interest of the assignor to take part with the assignee claiming the lien by substitution, and so interested to suppress every thing which would tend to defeat the lien and send the complainant back upon the assignor of the note. The established doctrine of this court is, that the admissions in the answer of the assignor, is not evidence against the assignee. Thus the assignee who sets up this implied lien, escapes the admissions which the assignor may make in answer to the interrogatories of the subpurchaser calling for a discovery.
Dissent of Ch. Í. Bibb.
It has been said, that this lien passes by assignment along with the note assigned, as the assignment of a note secured by mortgage carries along with it •the mortgage; and that there is no difference in principle between an assignment of a mortgage and an assignment of this equitable lien. There is a difference; and although the partition may be thin, yet it is visible, and should be suffered to divide and distinguish these two classes. A mortgage is a direct charge upon the estate. The lien implied in equity, is not an original charge upon the estate sold, but only an equity to resort to -it, in case the personal estate prove deficient. The mortgage is created luc •express contract, the lien is only implied, and de *307 pends on-the circumstances. The mortgage and the-note or bond secured by it, are connected by plain and direct written evidence, and the charge upon the land, as well as the intent of the parties, cannot be mistaken. The lien is an implied trust only; the connexion between, the note or bond, assigned and this trust, must be.made out by parol evidence. These distinctions, are, in my mind, sufficient to warrant a different rule.in equity, as to . the aid to be given either in cases of assignment of the debt, or in cases depending upon notice to-subpurchasers. In the cases of express contracts, enforced in equity, in favor of assignees, and against those who are pur-», chasers with notice of the equity, the contract which is the ground of equity, must, be evidenced by writing, according to the statute of frauds; the notice of that equity may or may not depend on parol evidence. But in cases of this equitable lien, raised by implication, and asserted by an assignee of a document of the debt, against a, subpurchaser of the legal estate, holding a receipt, against, the pur-; chase money, and charged.with notice of thqalleg-. ed lien, the whole equity is to. be raised,, by parol, against written evidence, in favor of the assignee of the debt; it is charged upon the subpurchaser, who. never contracted the.debt, by parol.in opposition to. the statute of frauds as suggested by Mr.' Sugden in his treatise, (p. 362-3.) That this implied lien is not extended in favor of third persons, is recognized in the cases of Coppin vs. Coppin, in Pollexfen vs. Moore; in Mr. Sugden’s treatise, (p. 358 and 363;) in Mr. Maddock’s treatise on the principles and practice of the jurisdiction of courts of equity, (vol. 2 p. 106;) and distinctly recognized in Brown vs. Gilman, (1 Mason’s Rep. 212,) also reported in 4 Wheaton, 297. In this latter case, Judge Story, in delivering the opinion of the circuit court, after a full and lucid examination of the doctrine of this equitable lien, and of a great number of the adjudged cases, in conclusion of the opinion of the court against the lien there claimed, uses this language: “the securities themselves,” (meaning the evidences Of debt set up as a lien) “were, from their negotiable nature, capable of being turned into cash, and in their transfer from hand to hand, they coub5 *308 have been supposed, to draw after them, in favor of the holder, a lien on the land for their payment.” So in this case, I think, it cannot be admitted, that the assignment of this note by Calloway to Eubank, in May, 1818, of a debt due from Ritchie, did draw after it a lien on the land, which Calloway had in March, 1817, conveyed to Ritchie, with a full acknowledgment of the receipt of the purchase money; nor that this lien has followed the land into the hands of Poston, who obtained the deed from Ritchie, to secure himself for his endorsements for Ritchie in Bank,
D¡ssent 0f Ch. J- Bi!
Dissent of Ch. J. Bibb*
Thirdly, There is a third objection to the Hen claimed in favor of the assignee Eubank, against Pos-! ton and the purchasers under the decree. Poston is a, bona fide creditor of Ritchie, with a specific lien by mortgage, on the houses and lots in question. That a vendor who has taken no other security for the purchase money, retains a Hen for it on the land as against the vendee or his heirs, is well settled. That it is defeated by alienation to a purchaser for valuar ble consideration, without notice, is equally well settled.
So the Hen may be defeated by other circumstan-ces; but what other circumstances will or will not, repel the lien, have been subjects of doubt, perplexity and difference among chancellors, as will be seen by the cases cited and commented on by the chancellor, in Mackreth vs. Symmons, (15 Pez. 342.) And these differences and doubts upon the subject, have so vexed the question, as that Lord Chancellor Eldon complains, that he is “not able to find any rule that is satisfactory' to Ifis mind;” (p. 342.) Again, after reviewing a number of cases, he says* (p. 350,) “The more modern authorities upon this subject have brought it to this inconvenient state) that the question is not a dry question upon the fact*whether a security was taken; but it depends upoii the circumstances of each case, whether the court is to infer, that the lien was intended to be reserved* or the credit was given, and exclusively given, to the person from whom the other security was taken.” PVithout pursuing the labyrinth which ha$ *309 "been made by the constructions of the word “seenrity,” and upon other modes of repelling the lien, I think it is now settled by adjudication, and upon considerations of irresistable force, that this implied lien as now claimed, ought not to be supported.
Dissent of Ch, J. Bibb,
In Bayley vs. Greenleaf and others, (7 Wheat, 46,) the Supreme Court of the United States, after a full discussion of the subject of lien, and a review of the adjudged cases, came to the conclusion that in no casé, has this lien been supported against A judgment creditor, against a mortgagee, or even against a creditor charging an heir who was bound by the bond of his ancestor. The opinion of the court is di’awn by the Chief Justice, with his usual ability; and the doctrine of this lien is considered from its foundation. The case is decided upon the broad and unqualified foundation, that there is no case in which the naked question has been determine .ed against the creditor.” “A vendor relying upon this lien ought to reduce it to a mortgage, so as to give notice of it to the world. If he does not, he is in some degree, accessary to the fraud committed ,on the public, by an act which exhibits the vendee as the complete owner of the estate on which he claims a secret iien. It would seem inconsistent with the principles of equity, and with the general spirit of our laws., that such a lien should be set up in a court .of chancery, to the exclusion of bona fide creditors. The court would require cases in which this principle is expressly decided, before its coi> rectness can be admitted. The counsel for the plaintiff say there are such cases, and cite the dictum of Sugden in his law of vendors, and the cases he quotes in support of the position.” The cases relied on are then severally examined, and the broad assertion attributed to Mr. Sugden, is denied to result from the cases referred to by him. After those cases are examined, the opinion proceeds thus: “The lien of the vendor, if in the nature of a trust, isa secret trust; and although to be preferred to any other subsequent equal equity, unconnected with a legal advantage, or equitable advantage, whick gives a superior claim to the legal estate, will be postponed to a subsequent equal equity connected *310 wil.li sucb advantage. This principle is laid down in Hargrave and Butler’s notes to Co. Litt. 290, b; and the case of Stanhope vs. Earl Verney is quoted in support of it. That was the case of an equitable mortgage, founded on the deposit of a deed for a term of years to attend the inheritance, with a declaration of the trust. This is a much stronger case. It is an actual conveyance of the legal estate.”
Dissent of Ch. J. Bibb.
“in the United States the claims of creditors stand on high ground. There is not, perhaps, a State in the Union, the laws of which do not make all conveyanees not recorded, and all secret trusts, void as to creditors as well as subsequent purchasers without notice. To support the secret lien of the vendor against a creditor who is a mortgagee, would be to counteract the spirit of these laws.”
Mr. Sugden’s treatise on the law of vendors, does say (p. 364,) that the assignees of a bankrupt take the estate of the bankrupt precisely in the same plight, and condition that the bankrupt held them, and that notice of an equity would affect them; he then says, (p. 365,) “creditors claiming under a conveyance from the purchaser, are bound in like manner as assignees, because they stand in the same situation as creditors under a commission;” and for this Fawell vs. Heelis, Ambler 724, is cited by him. The decision in that case does not warrant the doctrine; the text in Sugden is taken from what Lord Apsley stated as the argument or proposition to be considered; not as a proposition to which he assented. On the contrary, the explanation he gives of the cases cited in support of the proposition, Chapman vs. Tanner, 1 Tern. 267; Pollexfen vs. Moore, 3 Atk. 272; Fardiff vs. Scrugham, 8 Dec. 1769, shew that he dissented from that proposition and his decree is far from warranting any inference that he assented to it. Mrs. Faweil was claiming a lien for the purchase money of-the estate, against Heelis and others, assignees of John Faweil, in trust' for themselves and other creditors. The chancellor after examining the cases cited, states in few words, the pith of the case. “In this case,” (he says,) “it does not appear that it was the intention of the pat- *311 lies, that the vendor should have such a lien, but a receipt was taken on the back of the deed and the bond was accepted as a satisfaction for the money. If the vendor parts with his estate, and takes a security for the consideration money, there is no reason for a court of equity to assist him against the creditors of the purchaser;” and so the bill of Mrs. Fawell was dismissed. By the word “security” here, the chancellor meant the bond of John Fawell; and the dismissal of the bill, shews that he did not admit her lien against the creditors of John Fawell.
Dissent of Ch. J. Bibb,
The inaccuracies of some of the earlier chancery reporters, and the mistakes of the reporters, elementary writers and others, as to this word “security,” and of the real points decided in Chapman vs. Tanner, Pollexfen vs. Moore, Tordiff vs. Scrugham and Fawell vs. Heelis, have worked up this doctrine of implied lien to its present state of extravagance and uncertainty. It requires the good sense of Lord Chancellor Apsley, as expressed in Fawell vs. Heelis, to bring this subject of equity to a rule, clear, intelligible and certain; so that a purchaser may, by reasonable diligence and inspection of title papers, know when he is purchasing a sure, unincumbered title and estate. Vendors may easily secure themselves, by retaining the title, or taking a mortgage to secure the payment of the purchase money. But as it is, purchasers cannot know wjien they are safe against these secret trusts. If the deed is shown, with a receipt for the purchase money contained in it; a notice of this secret trust, given after he has paid his money and before he acquires the legal title, or after lie acquires the title and before he pays the whole purchase, may subject him to pay the debt of another.
The conclusion which I have come to, renders it unnecessary for me to say any thing upon the point, whether the court below, decided correctly in refusing to enforce the lien to the full value of the amount due on his judgment against Ritchie, instead of reducing it to the value of Kentucky Bank paper, according to Eubaidi’s endorsement of his ex- *312 edition. As I conceive Eubank liad no lien to bo enforced against Poston’s mortgage, and as the es*< tate has been sold under the decree of foreclosure, in favor of Poston, and has left no surplus, Eubank has already a decree for what he was not entitled to, much less is he entitled to have that amount increased.
Dissent of Ch. J. Bibb.
As to the cases of Kenny vs. Collins, 4 Litt. rep. 289; Johnson vs. Campbell, 4 Litt. 317, decided at fall term 1823, upon the subject of lien; and of Salter and Stapp vs. Richardson, 3 Mon. 204, which have been mentioned, a sense of duty bids me say, that had those cases come before me, I do not believe I should have been satisfied with such conclusions, as my mind now, cannot assent to them. The view which I have taken renders any thing more touching these cases, unnecessary at this time.
I have no disposition to unsettle that which has been settled. It is of the first importance that the administration of the laws should be steady and uniform. Questions have arisen and may arise, in which the interests of society are more concerned, that they should be settled, than in the accidental discrimination between this rule or that. In these a single decision should be imperative. There are others, in which the well being and security of society are deeply concerned; in which the judge is called'to choose between the propriety of following had precedents, evidently against the rules of law, of inconvenient action upon the community, and of evil tendency, or of making a new decision more conformable to the spirit and equity of the law. In others, he is called upon to choose between conflicting decisions in matters of deep concern to society. Of this latter class I take the questions in this case to be. I have called up the best lights of my understanding and judgment to assist in endeavoring to fix the rule and bring it to a just and equitable action on the community. My earnest desire is. that it should be so fixed as to conform to and advance the policy of the statutes, directing conveyances, mortgages and deeds of trust to be recorded, and requiring written evidences of agreements foy *313 tbe sales or conveyances of interests in lands; in short, to consult that certainty of tenure and security of enjoyment, intended to be promoted by the statutes concerning deeds, mortgages and other conveyances, and the statute to prevent frauds and perjuries. Upon the ground that the lien did not exist so as to be enforced against a bona fide creditor, holding a mortgage, I concurred in the decree in the case of Woods vs. the Bank of Kentucky, and not upon the reasons stated in that opinion.
D;sse¿t of Ch. J. Bibb,
Hanson, for plaintiff; Wickliffe and Mayes, for defendants.
What weight is due to the suggestions I have made upon this subject of implied lien, this questi'o vexata, I leave for others to determine. My own mind is well satisfied, that by retaining the title from 1813 to 1817, and then passing it to Ritchie, with a receipt for the purchase money, Calloway ought to be regarded as having waived his lien; that according to best opinions, this implied lien, is never supported in equity in favour of a third person claiming to substitute himself in place óf the vendor, and that it is not to be supported against a creditor of the vendee who holds the legal title to secure a bona fide debt. This is a contest between two creditors of an insolvent debtor. Poston has a bona fide debt, secured by a mortgage; Be holds'an equal iequity, connected with the legal'advantage. " It is á struggle for 'iHabufim in naufragio' Poston has gained it by his vigilance and prudence, and I know of no rule pr principle of equity applicable tó Eu-bank’s case, by which it can be taken frgm Poston and given to Eubank.
My opinion is, that the great error in the decree pf the circuit court, is in decreeing any thing in favor of Eubank; his bill should,have been dismissed^ and that he has no cause of complaint.